FILED

MAR - 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES FEDERAL DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Joseph P. Carson, P.E.**
**10953 Twin Harbour Drive**
**Knoxville, TN 37922**
**865-300-5831**

CASE NUMBER  1:07CV00443

JUDGE: Paul L. Friedman

DECK TYPE: TRO/Preliminary Injunction

DATE STAMP: 03/05/2007

**VS.**

**U.S. Office of Special Counsel (OSC**
**1730 M. St., NW**
**Suite 300**
**Washington, DC 20036**

## COMPLAINT OR
## PETITION FOR WRIT OF MANDAMUS

Comes the petitioner, who is pro se in this action, and respectfully says as follows:

He understands the Court is obligated to "read the pleadings of a pro se plaintiff liberally and interpret them to 'raise the strongest arguments they suggest,'" See <u>McPherson v. Coombe</u>, 174 F.3d 276, 280 (2nd Cir. 1999), quoting <u>Burgos v. Hopkins</u> 14 F.3d 787, 790 (2d Cir. 1994).   He perceives the legal issue presented in this case may be novel - whether a Court can direct an agency, via a writ of mandamus, or other remedy, to prepare and publish information which it has failed to when that information is required by statute to be disseminated in

1

publicly available reports made to the President and/or the Congress. Petitioner respectfully suggests this Court has jurisdiction to adjudicate this case and controversy, under authority which includes 5 U.S.C. 702 and 28 U.S.C. 1331, *et seq.* He also suggests that as a whistleblower within the meaning of the Whistleblower Protection Act of 1989, he has standing to raise all issues contained herein.

Petitioner requests this case be joined and/or consolidated to the pending case, Carson v. Office of Special Counsel, docket no. 06-1834, if deemed appropriate, as it seeks, via FOIA, some of the same information, although this action seeks information not sought in 06-1834 and 06-1834 seeks information not sought in this action.

By 5 USC 1218, the Office of Special Counsel (OSC) is required to provide specified information to Congress in its Annual Reports. Petitioner understands these Annual Reports are no longer statutory required, but OSC continues to make them and claims to make them per 5 USC 1218 (see exhibit 1).

The petitioner desires the Court direct OSC, if adequate legal grounds exist, to include all the information required by 5 USC 1218 in the Annual Reports to Congress it claims to make by 5 USC 1218, which is a public document. Exhibit 2 is a critique of OSC's compliance with 5 USC 1218 in its Annual Reports to

2

Congress.

The key legal question is whether a private citizen has standing to seek Court relief if public documents created by OSC do not contain the statutory required information that OSC claims they do. Petitioner simply does not know, but he knows he cannot force Congress or the President to correct OSC's non-compliance with law, so if a Court cannot direct relief, a private citizen is without remedy to governmental lawbreaking which denies the public statutory required information and/or allows an agency to claim it has complied with the law when it does not.

He also believes he has been greatly harmed, indirectly at least, because of OSC's non-compliance with law in reporting all the required information of 5 USC 1218, as it enables systemic and persistent non-compliance by Office of Special Counsel (OSC)with its statutory duties to protect federal employees, including him, from prohibited personnel practices (PPP's), as this Court is only too familiar (see <u>Carson v. OSC</u>, docket nos. 04-315, 05-537, and 06-1833).

## **THIS COURT'S JURISDICTION OVER THIS COMPLAINT**

1.  Petitioner does not know if this basic jurisdictional question has been addressed previously, so he does not know if this Court has jurisdiction over this claim.

**RELIEF SOUGHT**

2.      Petitioner seeks this Court direct OSC provide all the statutory information

described in 5 USC 1218 for all its Annual Reports to Congress for the past

7 years.

**THE ISSUES PRESENTED**

3.      If OSC is failing to comply with the law by not reporting all the required

information of 5 USC 1218 in its Annual Reports to Congress, which is a

public document, does a private citizen, who claims he is harmed by its

statutory non-compliance, or just wants access to the information, have

grounds to seek mandamus or other relief?

**THE REASONS WHY THE WRIT SHOULD ISSUE**

4.      Criteria for writs of mandamus to issue include: 1) the plaintiff must have a

clear right to the relief, 2) the defendant must have a clear duty to act, and 3)

no other adequate remedy must be available (See Jones v. Alexander, 609

F.2d 778 (5th Cir. 1980), *cert. denied*, 449 U.S. 832 (1980).

*Plaintiff must have a clear right to the relief:*

5.      5 USC 1218 detail the information OSC must include in its Annual Reports

to Congress, if it claims to make them.   Does a private citizen have a right

to insist that agencies comply with their statutory duties to make public

reports that contained statutory required information, and seek mandamus
relief when they fail to do so? If not, what remedies are available?

***The defendant must have a clear duty to act:***

6.   5 USC 1218 details the information OSC is to include in its Annual Reports
to Congress. While OSC may no longer be mandated to make these reports,
if it claims to do so, it has to comply with the law's requirements. It is not
doing so, as detailed by exhibits 1 and 2.

***No other adequate remedy must be available***:

7.   What other remedy is available, if not mandamus relief?

8.   The relief requested of OSC is essentially ministerial in nature - that OSC
comply with the law when it claims to make an Annual Report to Congress
per 5 USC 1218.

## CONCLUSION

9.   5 USC 1218 require specific information be contained in OSC's Annual
Reports to Congress, should OSC make such a report. OSC claims to make
Annual Reports to Congress per 5 USC 1218. It seems reasonable to
petitioner to think the District Court can order mandamus relief as necessary
to ensure OSC complies with the law when it claims to do so.

10.  By ABA model rules of Judicial Conduct, the Judge has positive legal and

5

professional obligations to "blow whistles" on evidence of attorney

malfeasance, which petitioner thinks is evidenced by OSC's failure to

comply with this statutory obligation, so he requests the Judge "blow

whistles" to the appropriate professional body on the apparent professional

malfeasance of involved OSC attorneys.

Respectfully Submitted,

_____

Joseph P. Carson, P.E., Petitioner
10953 Twin Harbour Drive
Knoxville, TN 37934
865-300-5831

6

LIST OF EXHIBITS, CARSON V. OSC
February 26, 2007

1.    OSC Annual Report to Congress for 2005 (previous OSC Annual
      Reports from 1998 are available at OSC's website www.osc.gov)

2.    Critique of OSC's Annual Report to Congress compliance with 5
      USC 1218, which would apply, in almost every particular to previous
      OSC Annual Reports to Congress for past 7 years.

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

25L

## I (a) PLAINTIFFS

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF 88888
(EXCEPT IN U.S. PLAINTIFF CASES)

Knox County, TN

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Pro Se Joe Carson 10953 Twin Harbor
Knoxville, TN 37934  865-300-583

## DEFENDANTS

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN L...

CASE NUMBER   1:07CV00443

JUDGE: Paul L. Friedman

DECK TYPE: TRO/Preliminary Injunction

DATE STAMP: 03/05/2007

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 2 U.S. Government Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITI...
FOR PLAI...

... CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**☐ A. Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| □ **G.** *Habeas Corpus/ 2255* | □ **H.** *Employment Discrimination* | □ **I.** *FOIA/PRIVACY ACT* | □ **J.** *Student Loan* |
|---|---|---|---|
| □ 530 Habeas Corpus-General □ 510 Motion/Vacate Sentence | □ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ 895 Freedom of Information Act □ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | □ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| □ **K.** *Labor/ERISA (non-employment)* | □ **L.** *Other Civil Rights (non-employment)* | □ **M.** *Contract* | □ **N.** *Three-Judge Court* |
|---|---|---|---|
| □ 710 Fair Labor Standards Act □ 720 Labor/Mgmt. Relations □ 730 Labor/Mgmt. Reporting & Disclosure Act □ 740 Labor Railway Act □ 790 Other Labor Litigation □ 791 Empl. Ret. Inc. Security Act | □ 441 Voting (if not Voting Rights Act) □ 443 Housing/Accommodations □ 444 Welfare □ 440 Other Civil Rights □ 445 American w/Disabilities- Employment □ 446 Americans w/Disabilities- Other | □ 110 Insurance □ 120 Marine □ 130 Miller Act □ 140 Negotiable Instrument □ 150 Recovery of Overpayment & Enforcement of Judgment □ 153 Recovery of Overpayment of Veteran's Benefits □ 160 Stockholder's Suits □ 190 Other Contracts □ 195 Contract Product Liability □ 196 Franchise | □ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

□ 1 Original Proceeding    □ 2 Removed from State Court    □ 3 Remanded from Appellate Court    □ 4 Reinstated or Reopened    □ 5 Transferred from another district (specify)    □ Multi district Litigation    □ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 U.S.C. 1361 – OSC Annual Reports do not comply w/ 5 USC 1218

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS □ ACTION UNDER F.R.C.P. 23    **DEMAND $**    Check YES only if demanded in complaint    **JURY DEMAND:** □ YES  □ NO

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    □ YES  □ NO    If yes, please complete related case form.

DATE 3/3/07    SIGNATURE OF ATTORNEY OF RECORD

3/5/07

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# ANNUAL REPORT
# TO
# CONGRESS



# U.S. OFFICE OF SPECIAL COUNSEL
# FISCAL YEAR 2005

www.osc.gov



# REPORT TO CONGRESS

U.S. OFFICE OF SPECIAL COUNSEL
FISCAL YEAR 2005

www.osc.gov



**U.S. Office of Special Counsel**

1730 M Street, N.W., Suite 218
Washington, D.C. 20036-4505

**The Special Counsel**

The Honorable Richard B. Cheney
President of the Senate
Washington, DC 20510

The Honorable J. Dennis Hastert
Speaker of the House of Representatives
Washington, DC 20515

Dear Mr. President and Mr. Speaker:

I respectfully submit, in accordance with 5 U.S.C. § 1218, Fiscal Year 2005 Report to Congress from the U.S. Office of Special Counsel. A copy of this report will also be sent to each Member of Congress.

Sincerely,

Scott J. Bloch

Enclosure

## TABLE OF CONTENTS

| | PAGE |
|---|---|
| BIOGRAPHY OF THE SPECIAL COUNSEL | 1 |
| MESSAGE FROM THE SPECIAL COUNSEL | 2 |
| INTRODUCTION | 4 |
| OVERVIEW OF OSC OPERATIONS | 4 |
|     Statutory Background | 4 |
|     Mission | 5 |
|     Budget and Staffing | 7 |
|     Organization and Functions | 7 |
|     Immediate Office of the Special Counsel | 7 |
|     Complaints Examining Unit | 7 |
|     Disclosure Unit | 7 |
|     Investigation and Prosecution Division | 7 |
|     Hatch Act Unit | 8 |
|     Special Projects Unit | 8 |
|     Alternative Dispute Resolution Program | 8 |
|     Legal Counsel and Policy Division | 8 |
|     Management and Budget Division | 8 |
|     Training Office | 8 |
|     Customer Service Unit | 8 |
| PROHIBITED PERSONNEL PRACTICE COMPLAINTS | 9 |
|     Receipts and Investigations | 9 |
|     Stays | 10 |
|     Mediation | 10 |
|     Corrective and Disciplinary Action | 11 |
|     Summary of Favorable Actions | 14 |
| HATCH ACT MATTERS | 15 |
|     Overview | 15 |
|     Advisory Opinions | 15 |
|     Enforcement Actions | 15 |
| WHISTLEBLOWER DISCLOSURES | 18 |
|     Overview | 18 |
|     Public Servant Award Ceremony | 20 |
|     Results of Referrals to Agency Heads | 21 |

UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT RIGHTS ACT         22

    USERRA Filings with the MSPB         23
    The USERRA Demonstration Project         24

OUTREACH PROGRAM         25

ANNUAL SURVEY PROGRAM         25

FURTHER INFORMATION         26

    Annual Report         26
    Prohibited Personnel Practice Complaints         26
    Mediation Program         27
    Hatch Act Questions         27
    Whistleblower Disclosures         27
    Uniformed Services Employment and Reemployment Rights Act         28
    Outreach Program         28

SUPPORTING TABLES:

  1. Summary of Overall Agency Matters and Actions         06
  2. Summary of PPP Complaints Activity – Receipts and Processing         09
  3. Summary of PPP Complaints Activity – Mediation Program         11
  4. Summary of PPP Complaints Activity – Favorable Actions         14
  5. Summary of Hatch Act Advisory Opinion and Complaint Activity         18
  6. Summary of Whistleblower Disclosure Activity – Receipts and Dispositions         19
  7. Summary of USERRA Referral Activity         22
  8. Summary of USERRA Demonstration Project Referral Activity         24

APPENDICES:

    Survey Results Appendix A, Totals and Response Options         29
    Survey Results Appendix B, PPP         30
    Survey Results Appendix C, HA         34
    Survey Results Appendix D, USERRA         35
    Acronyms Appendix E         37
    Endnotes         38

## BIOGRAPHY OF THE SPECIAL COUNSEL



**Scott J. Bloch**

On June 26, 2003, President George W. Bush nominated Scott J. Bloch for the position of Special Counsel at the U.S. Office of Special Counsel. The U.S. Senate unanimously confirmed Mr. Bloch on December 9, 2003. On January 5, 2004, he was sworn in to serve a five-year term.

Mr. Bloch brings over 17 years of experience to the Office of Special Counsel, including litigation of employment, lawyer ethics, and complex cases before state courts, federal courts and administrative tribunals. He briefed and argued cases before state and federal appellate courts and is admitted to practice in the United States Supreme Court.

From 2001-2003, Mr. Bloch served as Associate Director and then Deputy Director and Counsel to the Task Force for Faith-based and Community Initiatives at the U.S. Department of Justice, where he worked on First Amendment cases, regulations, intergovernmental outreach, and programmatic initiatives. Before serving in the Justice Department, he was a partner with Stevens & Brand, LLP, of Lawrence, Kansas, where he practiced in the areas of civil rights law, employment law, and legal ethics. Mr. Bloch tried jury trials before state and federal courts, representing employees and employers in cases involving whistleblower and other retaliation claims, as well as civil rights claims. He worked on important cases that set precedents in the field of legal ethics, including a ground-breaking Texas case that changed the way plaintiffs' lawyers handle mass tort cases.

Mr. Bloch served as chair of his county Bar Ethics and Grievance Committee, investigating cases of alleged breaches by attorneys of ethics rules, and making recommendations to the state Supreme Court on disciplinary action. He also served on the state board of discipline, hearing testimony and legal arguments, and making findings on appropriate discipline of attorneys. For five years, he served as an Adjunct Professor at the University of Kansas School of Law.

Mr. Bloch earned his bachelor's and law degree from the University of Kansas, where he graduated Order of the Coif, and served on the Boards of Editors of *The Kansas Law Review and The Kansas Criminal Procedure Review*.

Mr. Bloch has published various articles including: "The Judgment of History: Faction, Political Machines, and the Hatch Act," published in the *University of Pennsylvania Journal of Labor & Employment Law* (7 U. Pa. J. Lab. & Emp. L. 225 (2005), and "Don't Bury the Hatch Act: Hidden Dangers for the Unwary and Politically Active Prosecutor's Office Employee," published in *The Prosecutor* in the September/October 2004 issue (Vol.38/Number 5, Sept/Oct 2004).

He lives with his wife, Catherine, and six of his seven children in Alexandria, Virginia. His oldest is a Corporal in the United States Marine Corps and is currently in his third tour of duty in Iraq.

1    U.S. Office of Special Counsel Fiscal Year 2005 Annual Report

## MESSAGE FROM THE SPECIAL COUNSEL SCOTT J. BLOCH

This is OSC's 2005 Annual Report. We have provided case samples, statistics, graphical charts, and descriptions of changes in the agency. It is my hope that you will find this information informative.

We have made great progress in better protecting whistleblowers and safeguarding the merit system. We succeeded in our efforts at overall backlog reduction and reorganized the agency to better serve federal employees.

While OSC received much credit for resolving the cases in the backlog with full and fair resolution, the agency became subject to some criticism that Disclosure Unit (DU) cases were closed without adequate review. The DU cases resolved were primarily cases that had been identified as likely closures during the last two to three years, but had not been closed due to the focus on and volume of the several types of higher priority DU cases. To dissolve this criticism entirely, OSC invited a bipartisan group of Congressional staffers to visit OSC and review the case files and the processes used in resolving these cases, as well as PPP cases. The conclusion of the bipartisan investigation was that not a single case closed for lack of merit was found to have merit. After this investigation, OSC's successes in reducing the DU backlog and reducing the PPP backlog while increasing the internal rate of referral were commended in a congratulatory letter from the U.S. House of Representatives Committee on Government Reform (see letter below).

Having successfully reduced backlogs in the Complaints Examining Unit, the Hatch Act Unit, and the Disclosure Unit in Fiscal Year 2004, we tackled the Investigation and Prosecution Division (IPD) backlog in FY 2005 and enjoyed similar success. In FY 2005, after thorough review, OSC processed 1774 Prohibited Personnel Practice cases, including 576 "old" cases, some of which had been in the IPD for two, three and four years. The reduction of this IPD backlog puts the agency in an excellent position at the start of FY 2006.

Several studies, including one by GAO, had revealed that OSC was clogged with redundant layers of bureaucratic review that stifled processing times and contributed to case backlogs. In January of 2005, OSC initiated a reorganization of the agency. We eliminated a system of three co-equal investigation and prosecution units doing the same work and consolidated them into one Investigation and Prosecution Division. We added a new field office in Detroit, which is already doing an excellent job of providing assistance to Federal employees in the Northern and Midwestern portions of the country. We created a Document Control Branch to handle the records management needs of the agency. This new branch, along with the Human Resources, Information Technology, Budget, Finance, and Procurement functions were all successfully consolidated from various disparate parts of the agency into a newly created Management and Budget Division. This streamlining of the administrative functions has assisted the agency's management, as well as the individual attorneys and investigators. OSC also created a Customer Service Unit to better handle inquiries from federal employees with general questions about the claims process or specific questions about their own open claims at OSC. We also "flattened" the agency by changing processes to enable swifter decision-making by experienced employees and first-line managers.

Fiscal Year 2005 also saw Congress expand OSC's role in enforcing the law that protects the

employment and reemployment rights of persons who serve in the uniformed services. Under a demonstration project that took effect in February 2005, OSC has exclusive investigative authority over certain federal sector claims brought under the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA). I am very proud of what we have achieved in a very short period of time. In the eight months remaining in the fiscal year since the inception of the demonstration project, OSC received 111 USERRA cases for investigation and obtained corrective action in 28% of the cases completed. For example, OSC had agencies appoint service members to jobs with back pay where they had been wrongfully denied initial employment because of their military service obligations and secured reemployment with full benefits — such as within grade increases in salaries and career ladder promotions — for returning service members. OSC will continue to vigorously enforce USERRA under the demonstration project for the benefit of the country's brave service members.

TOM DAVIS, VIRGINIA,
CHAIRMAN

CHRISTOPHER SHAYS, CONNECTICUT
DAN BURTON, INDIANA
ILEANA ROS-LEHTINEN, FLORIDA
JOHN M. McHUGH, NEW YORK
JOHN L. MICA, FLORIDA
GIL GUTKNECHT, MINNESOTA
MARK E. SOUDER, INDIANA
STEVEN C. LaTOURETTE, OHIO
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
CANDICE MILLER, MICHIGAN
MICHAEL R. TURNER, OHIO
DARRELL ISSA, CALIFORNIA
VIRGINIA BROWN-WAITE, FLORIDA
JON C. PORTER, NEVADA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
CHARLES W. DENT, PENNSYLVANIA
VIRGINIA FOXX, NORTH CAROLINA

ONE HUNDRED NINTH CONGRESS

# Congress of the United States
## House of Representatives

COMMITTEE ON GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515-6143

MAJORITY (202) 225-5074
FACSIMILE (202) 225-3974
MINORITY (202) 225-5051
TTY (202) 225-6852

http://reform.house.gov

HENRY A. WAXMAN, CALIFORNIA,
RANKING MINORITY MEMBER

TOM LANTOS, CALIFORNIA
MAJOR R. OWENS, NEW YORK
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
CHRIS VAN HOLLEN, MARYLAND
LINDA T. SANCHEZ, CALIFORNIA
C.A. DUTCH RUPPERSBERGER,
MARYLAND
BRIAN HIGGINS, NEW YORK
ELEANOR HOLMES NORTON,
DISTRICT OF COLUMBIA

BERNARD SANDERS, VERMONT,
INDEPENDENT

May 17, 2005

VIA FACSIMILE

Mr. Scott Bloch
U.S. Office of Special Counsel
1730 M Street, N.W., Suite 300
Washington, D.C. 20036-4505

Dear Mr. Bloch,

The Committee on Government Reform and has recently reviewed your efforts to respond to the findings of Government Accountability Office (GAO) 04-36. In that report, the GAO noted that the Office of Special Counsel (OSC) demonstrated a chronic inability to process cases in a timely manner which inevitably led to case backlogs. The report called for the OSC to develop a comprehensive strategy to address these recurrent failures.

We appreciate the professional seriousness with which you approached these recommendations and reduced the existing backlogs in the year following this report. Unfortunately, this activity, while beneficial to whistleblowers, was regarded with suspicion by activists who claim to work on behalf of whistleblowers.

At your invitation, a bipartisan group of congressional staff visited your offices on three occasions to review closed cases. The staff reviewed any closed case they requested, and you provided access to decision makers for questions and policy discussions. At the end of this period of review, one previously critical Senate staffer informed us "we have satisfied ourselves that they did not throw any folders into the Potomac." We are also satisfied that your hard work – and smart work – has resulted in a more responsive Office of Special Counsel.

We want to congratulate you on your efforts to improve the services you provide to whistleblowers. We continue to be impressed with the sincerity and pragmatism with which you and all your staff approach your jobs. You are providing a great service to the American people and the Federal government by protecting whistleblowers from illegal reprisals.

Sincerely,

Chairman Tom Davis
Committee on Government Reform

Chairman Jon Porter
Subcommittee on the Federal Workforce

cc: Rep. Henry Waxman, Ranking Member

## INTRODUCTION

The U.S. Office of Special Counsel (OSC) is an independent federal investigative and prosecutorial agency. Its primary mission is to safeguard the merit system in federal employment, by protecting employees and applicants from prohibited personnel practices, especially reprisal for whistleblowing. OSC also has jurisdiction under the Hatch Act to enforce restrictions on political activity by government employees. In addition, the agency operates a secure channel for disclosures by federal whistleblowers of government wrongdoing. Finally, OSC enforces federal employment rights secured by the Uniformed Services Employment and Reemployment Rights Act.

## OVERVIEW OF OSC OPERATIONS

*Statutory Background*

OSC was first established on January 1, 1979.[1] From then until 1989, it operated as an autonomous investigative and prosecutorial arm of the Merit Systems Protection Board (MSPB). By law, OSC received and investigated complaints from current and former federal employees, and applicants for federal employment, alleging prohibited personnel practices by federal agencies; provided advice on restrictions imposed by the Hatch Act on political activity by covered federal, state, and local government employees; and received disclosures from federal whistleblowers (current and former employees, and applicants for employment) about wrongdoing in government agencies. The office also enforced restrictions against prohibited personnel practices and political activity by filing, where appropriate, petitions for corrective and/or disciplinary action with the Board. In 1989, Congress enacted the Whistleblower Protection Act. The law made OSC an independent agency within the Executive Branch, with continued

responsibility for the functions described above. It also enhanced protections against reprisal for employees who disclose wrongdoing in the federal government, and strengthened OSC's ability to enforce those protections.[2] The Congress passed legislation in 1993 that significantly amended Hatch Act provisions applicable to federal and District of Columbia (D.C.) government employees, and enforced by OSC.[3] Provisions of the act enforced by OSC with respect to certain state and local government employees were unaffected by the 1993 amendments.

In 1994, the Uniformed Services Employment and Reemployment Rights Act (USERRA) became law. It defined employment-related rights of persons in connection with military service, prohibited discrimination against them because of that service, and gave OSC new authority to pursue remedies for violations by federal agencies.[4] OSC's 1994 reauthorization act expanded protections for federal employees, and defined new responsibilities for OSC and other federal agencies. It provided that within 240 days after receiving a prohibited personnel practice complaint, OSC should determine whether there are reasonable grounds to believe that such a violation occurred, exists, or is to be taken. The act extended the protections of certain legal provisions enforced by OSC to approximately 60,000 employees of what was then known as the Veterans Administration (now the Department of Veterans Affairs), and to employees of certain government corporations. It also broadened the scope of personnel actions covered under these provisions. Finally, the act made federal agencies responsible for informing their employees of available rights and remedies under the Whistleblower Protection Act, and directed agencies to consult with OSC in that process.[5]

In November of 2001, Congress enacted the Aviation and Transportation Security Act, which created the Transportation Security Administration (TSA). Under the act, non-security screener employees of TSA could file allegations of reprisal for whistleblowing with OSC and the MSPB. The approximately 45,000 security screeners in TSA, however, could not pursue such complaints at OSC or the MSPB.

OSC efforts led to the signing of a memorandum of understanding (MOU) with TSA in May 2002, under which OSC would review whistleblower retaliation complaints from security screeners, and recommend corrective or disciplinary action to TSA when warranted. The MOU did not (and could not), however, provide for OSC enforcement action before the MSPB, or for individual right of action (IRA) appeals by security screeners to the MSPB.

*OSC's Mission*

OSC's mission is to protect current and former federal employees, and applicants for federal employment, especially whistleblowers, from prohibited employment practices; promote and enforce compliance by government employees with legal restrictions on political activity, and facilitate disclosures by federal whistleblowers about government wrongdoing. OSC carries out this mission by:

• investigating complaints of prohibited personnel practices, especially reprisal for whistleblowing, and pursuing remedies for violations;

• providing advisory opinions on, and enforcing Hatch Act restrictions on political activity;

• operating an independent and secure channel for disclosures of wrongdoing in federal agencies;

• protecting reemployment and antidiscrimination rights of veterans under the USERRA; and

• promoting greater understanding of the rights and responsibilities of federal employees under the laws enforced by OSC.

U.S. Office of Special Counsel Fiscal Year 2005 Annual Report 5

*Summary of Year's Activity*

The table below summarizes OSC's activity for FY 2005 (with comparative data for the previous fiscal year).  More detailed data for each mission of the agency can be found in Tables 2-8, which appear in the sections of this report related to the individual units.

| Table 1    Summary of Overall Agency Matters[a] and Actions | FY 2004 | FY 2005[b] |
|---|---|---|
| Matters pending at beginning of fiscal year | 1,921 | 995 |
| New matters received | 2,754 | 2,684 |
| Matters closed | 3,680 | 2,685 |
| Matters pending at end of fiscal year | 995 | 994 |
| Corrective actions obtained | 112 | 93 |

[a] The term "matters" in this table includes: prohibited personnel practice complaints (including Transportation Security Administration matters), Hatch Act complaints, whistleblower disclosures (DU matters), USERRA referrals from the MSPB pursuant to 5 U.S.C. § 1221(f)(3).

[b] Includes USERRA Demonstration Project matters

*Budget and Staffing*

During FY 2005, OSC operated with a budget of $15,325,000, and a full-time equivalent personnel staff of approximately 113 employees.

*OSC's Internal Organization and Functions*

OSC maintains its headquarters office in Washington, D.C. Four field offices are located in Dallas, Oakland, Detroit, and Washington, D.C. Agency components during FY2005 include the Immediate Office of the Special Counsel (IOSC), five operating units/divisions and five supporting offices explained in detail below.

**Immediate Office of the Special Counsel.** The Special Counsel and staff in IOSC are responsible for policy making and overall management of OSC. They also manage the agency's congressional liaison and public affairs activities, and its outreach program, which includes promotion of compliance by other federal agencies with the employee information requirement at 5 U.S.C. § 2302(c).

**Complaints Examining Unit.** This is the intake point for all complaints alleging prohibited personnel practices and other violations of civil service law, rule, or regulation within OSC's jurisdiction.[6] This Unit is responsible for screening up to 1,700 prohibited personnel practice cases per year. Attorneys and personnel management specialists conduct an initial review of complaints to determine if they are within OSC's jurisdiction, and if so, whether further investigation is warranted. The unit refers all matters stating a potentially valid claim to the Investigation and Prosecution Division (IPD) for further investigation that may lead to prosecution, corrective action, and/or disciplinary action.[7]

**Disclosure Unit.** This unit is responsible for receiving and reviewing disclosures received from federal whistleblowers. It advises the Special Counsel on the appropriate disposition of the information disclosed (including possible referral to the head of the agency involved for an investigation and report to OSC; referral to an agency Inspector General; or closure). The unit also reviews agency reports of investigation, to determine whether they appear to be reasonable and in compliance with statutory requirements before the Special Counsel sends them to the President and appropriate congressional oversight committees.

**Investigation and Prosecution Division.** Formerly three parallel units, staffed primarily by investigators and attorneys, the reorganization includes one IPD (comprised of four field offices, each with greater personal initiative and accountability) which conducts field investigations of matters referred after preliminary inquiry by the CEU. IPD attorneys conduct a legal analysis after investigations are completed to determine whether the evidence is sufficient to establish that a prohibited personnel practice (or other violation within OSC's jurisdiction) has occurred. Investigators work with attorneys in evaluating whether a matter warrants corrective action, disciplinary action, or both.

If meritorious cases cannot be resolved through negotiation with the agency involved, division attorneys represent the Special Counsel in any litigation before the MSPB. They also represent the Special Counsel when OSC intervenes, or otherwise participates, in other proceedings before the MSPB. Finally, division investigators and attorneys also investigate alleged violations of the Hatch Act and the Uniformed Services Employment and Reemployment Rights Act. However, under a new pilot program, most USERRA functions are now housed in a new USERRA unit in the Special Projects Unit to assure uniformity of policy, greater initiative, and accountability regarding the new pilot.

**Hatch Act Unit.** The unit issues advisory opinions to individuals seeking information about Hatch Act restrictions on political activity by federal, and certain state and local, government employees. The unit is also responsible for enforcing the act. It reviews complaints alleging a Hatch Act violation and either investigates and prosecutes, or refers the matter to the IPD. It also oversees Hatch Act matters assigned to the IPD.

**Special Projects Unit.** This unit uses senior trial lawyers to work cases of high priority and has also been used by the Special Counsel to conduct internal research on the processes and procedures of the operational units at OSC. In addition, this unit handles a new special project assigned by P.L. 108-454 that requires OSC to investigate the reemployment rights of military service members under USERRA, which involves new functions, increased caseload, and new personnel.

**Alternative Dispute Resolution Program.** In selected cases referred by the Complaints Examining Unit for further investigation, an Alternative Dispute Resolution specialist contacts the complainant and the agency involved, and invites them to participate in OSC's voluntary Mediation Program. If mediation resolves the complaint, the parties execute a written and binding settlement agreement; if not, the complaint is referred for further investigation.

**Legal Counsel and Policy Division.** This division provides general counsel and policy services to OSC, including legal advice and support on management and administrative matters; legal defense of OSC in litigation filed against the agency; processing of FOIA requests and appeals; policy planning and development; and management of the agency ethics program.

**Management and Budget Division.** This division provides administrative and management support services to OSC, in furtherance of program, human capital, and budget decisions. Division also includes the Information Technology Branch, Human Resources Branch, Document Control Branch and Budget and Procurement branch. The purpose of this division is to put the administrative support functions under one authority.

**Training Office.** All new employees assigned to an operational unit receive training before case handling. All new managers and supervisors receive training on leadership and the drafting of managerial documents. Training also includes trial related training, cross training to help assist other units if or when they develop a backlog and other advanced, or specialized training as needed.

**Customer Service Unit.** This unit helps OSC staff better serve the public and federal employees and OSC operational units. Having specific personnel assigned for this purpose will help OSC gain a reputation of better customer service within the federal workforce. In the past, this function has been handled by rotating OSC staff to answer inquiries from the public or help with filing complaints and/or filling out forms.

## PROHIBITED PERSONNEL PRACTICE COMPLAINTS

*Receipts and Investigations*

OSC is authorized to receive and investigate complaints alleging any one or more of 12 prohibited personnel practices defined by law.[8]

Due to the backlog reduction effort in CEU during FY 2004, the number of complaints referred to the IPD for a field investigation in FY 2004 (244) spiked above all other fiscal years measured.  In FY 2005, there were 198, which was higher than in FY 2002 and FY 2003.

The percentage of PPP cases processed in less than 240 days was down to 67.5% during FY 2005.  This is understandable because FY 2005 was the year of the PPP backlog reduction in the IPD.  After thorough review, many cases which had been in the IPD two or more years were processed during FY 2005.  The obvious effect of this was an increase in the number processed in more than 240 days, which led to a lower percentage of cases processed in under 240 days.

**Table 2**, below, contains summary data (with comparative data for the two previous fiscal years) on OSC's receipt and processing of such complaints during FY 2005 [9]

Wrongful termination for Whistleblowing. The complainant alleged wrongful termination in violation of 5 U.S.C. § 2302(b)(8) and (b)(9) for whistleblowing and filing a union grievance.  He had been forced to work overtime with no compensation and without proper approval.  When he refused to drop the grievance, his supervisor threatened him with termination.  Both parties agreed to OSC mediation and all issues were resolved in a timely manner.

| TABLE 2 | Summary of Prohibited Personnel Practice (PPP) Complaints  Activity – Receipts and Processing | | FY2003 | FY2004 | FY2005 |
|---|---|---|---|---|---|
| Pending complaints carried over from previous fiscal year | | | 594 | 653 | 524 |
| New complaints received (Intake Unit) | | | 1,791 | 1,964 | 1,771 |
| *Total complaints:* | | | 2,385 | 2,617 | 2,295 |
| Complaints referred for field investigation | | | 162 | 244 | 198 |
| Complaints processed and closed | | | 1,732 | 2,093 | 1,774 |
| Processing times | *Less than 240 days* | | 1,471 | 1,799 | 1,198 |
| | *More than 240 days* | | 261 | 294 | 576 |
| Percentage processed in under 240 days | | | 85% | 86% | 67.5% |

*Stays*

An individual may request that the Special Counsel seek to delay, or "stay," an adverse personnel action, pending investigation of the action by OSC. If the Special Counsel has reasonable grounds to believe that the action resulted from a prohibited personnel practice, OSC may ask the agency involved to delay the personnel action. If the agency does not agree to a delay, OSC may then ask the Merit Systems Protection Board to stay the action. During 2004, OSC obtained 4 stays of personnel actions through negotiation with agencies, or litigation at the MSPB.

*Mediation*

OSC offers mediation in selected prohibited personnel practice cases as an alternative to further investigation after referral by the Complaints Examining Unit. Once a case is identified as mediation-appropriate, an Alternative Dispute Resolution Specialist contacts the parties to discuss OSC's program. An offer of mediation is made to the complainant first. If the complainant accepts, OSC then offers mediation to the agency involved. Pre-mediation discussions are designed to help the parties form realistic expectations and well-defined objectives for the mediation process. Mediation can result in monetary recovery, which can include retroactive promotions, attorney fees, and lump sum payments. In addition to monetary recovery, the benefits that complainants can receive include revised performance appraisals, transfers, and letters of recommendation. There were five formal mediations of PPP matters during FY 2005 (compared to 18 in FY 2004). 100% of these five mediations were successful. There are two reasons contributing to the lower number of mediations which occurred in FY 2005:

1. The number of matters identified as mediation-appropriate was 22 in FY 2005, lower than in previous years. This was due to a redesigned ADR program that is headed by an experienced SES career employee. Under this person, the ADR unit adopted a different operating philosophy. In the past, all cases were equally considered for mediation. Now, more specific criteria are applied concerning the merits of the case. The result was that the total number of cases considered mediation-appropriate has been lowered. In addition, more staff have become involved in mediation, have received mediation training, and have participated in successful mediation teams.

2. The other factor in this lower number of mediations is the acceptance by the complainant of OSC's offer to mediate, which dropped from 68% in FY 2004 to 27% in FY 2005. OSC does not have control over whether complainants will agree to enter the mediation process. (See **Table 3** below).

> <u>Disclosure led to resignation</u>. The complainant alleged that the Agency proposed her termination in violation of 5 U.S.C. § 2302(b)(8) and (b)(9), causing her to resign during her probationary period. She had previously disclosed travel fraud and claim reimbursement irregularities. Among those implicated in her disclosures were various high-level officials with responsibility for overseeing financial matters in the Agency. Some of the disclosures resulted in investigations by the Office of the Inspector General (OIG). She cooperated with the OIG during these investigations. The parties agreed to OSC mediation and all issues were resolved.

| TABLE 3   Summary of Prohibited Personnel Practice Complaints Activity – Mediation Program | | FY2003 | FY2004 | FY2005 |
|---|---|---|---|---|
| Matters identified before investigation as mediation-appropriate | | 43 | 82 | 22 |
| Initial acceptance rates by parties | Complainants | 82% | 68% | 27% |
| | Agencies | 69% | 64% | 22% |
| Mediated and other resolutions | | 23 | 18 | 5 |
| Resolution rate – OSC mediation program | | 92% | 86% | 100% |

*Corrective and Disciplinary Actions*

If, after investigation of a complaint, OSC believes that a prohibited personnel practice has been committed, OSC notifies the agency involved. By law, before initiating litigation seeking corrective action from the Merit Systems Protection Board (the Board), OSC must report its findings and recommendations to the agency involved. Once the agency has had a reasonable period of time to take corrective action and fails to do so, OSC may file an enforcement action with the Board. Usually, however, corrective action is obtained through negotiation by OSC of a settlement between the complainant and the agency involved.

If OSC determines that disciplinary action (the imposition of discipline on an employee who has committed a violation) is warranted, it can file a complaint directly with the Board. Should the agency agree to take appropriate disciplinary action on its own initiative, then the matter can be settled without resort to an MSPB proceeding.

The following are examples of corrective and disciplinary actions obtained by OSC in FY 2005 through negotiation with the agency involved:

Nepotism. OSC secured disciplinary and corrective action in a case in which agency management officials violated nepotism laws and granted an unauthorized preference or advantage to certain applicants for vacant positions in an installation during the fall of 1999. Our investigation revealed that the selecting official completed job applications and advanced the candidacy of several relatives of agency officials and advocated for her own daughter's employment. Our investigation also revealed that the selecting official's supervisor and another Division Chief advocated for their respective daughters' employment for one of the vacant positions. At OSC request, the agency suspended the selecting official for five days and her supervisor for three days, and gave the Division Chief an oral admonishment that will remain in his supervisory file for two years. The agency also agreed to provide Outreach training about prohibited personnel practices to relevant management officials.

Unauthorized Preference. OSC secured disciplinary and corrective action in a case in which a former Chief Administrative Law Judge (ALJ) of a federal agency granted an unauthorized preference to an employee. The ALJ selected the employee in 1998 as an Attorney Adviser and 18 months later, made inquiries with the agency's personnel about raising her grade. In April 2000, the servicing personnel office acted on the ALJ's request, retroactively converting the employee to a higher grade as of November 1998, 90 days after her original appointment and awarding her back pay. Four months later, the ALJ selected the employee for a management position for which she would not have been qualified without the retroactive upgrade.

The agency corrected all of the employee's SF-50's; initiated collection proceedings against her for the difference in when she would have received her promotions absent the unauthorized preference; and offered priority consideration for future similar positions to the other candidates for the management position.

Retaliation for Protected Activity. OSC secured corrective action in a case in which a federal employee alleged that he was given a directed reassignment from his duty station in Virginia, to California, in retaliation for having joined in a class action lawsuit against the agency. Prior to investigating the matter, OSC secured an agreement with the agency allowing the employee to remain in Virginia, which stayed in effect until he was ready to retire.

Reprisal for Protected Activity. OSC settled a case in which a former Security Specialist at a federal agency alleged that he was suspended for 14 days because he provided testimony in an IG investigation and released a draft IG report to the media. Additionally, the employee alleged that his security clearance was suspended and he was reassigned to a non-security clearance position at the agency because of his disclosure. As a result of our investigation and conclusion that the agency violated the whistleblower statute when it suspended the employee, in part, because of his protected disclosure of the unclassified draft IG report, the agency agreed to (1) rescind the 14-day suspension; (2) compensate the employee for lost pay plus interest; (3) restore all related benefits from the rescission of the 14-day suspension; (4) pay the employee $2,000 in attorney's fees; and (5) expunge all records related to the employee's 14-day suspension from his employment files, with the exception of his Personnel Security file.

Reprisal for Protected Activity. In February of 2003, a supervisory systems accountant at a federal agency in Alabama, alleged that she was given a letter of reprimand in part because she disclosed to the Office of Inspector General (OIG) in May of 2002 that her two supervisors violated the Federal Acquisition Regulation and abused their authority. The OIG investigation substantiated five of complainant's thirteen allegations. Investigation revealed that her disclosures were a contributing factor in the decision by her first-line supervisor to reprimand her. The agency agreed to pull the letter of reprimand from the employee's Official Personnel File.

Conflict of Interest. OSC settled a case in which an employee alleged that the former Director of a federal agency committed a prohibited personnel practice when she noncompetitive hired another individual who was jointly and severally liable with the former Director on a $261,600 promissory note secured by their personal residence - a $2,885 monthly mortgage obligation. The former Director appointed this individual to a Supervisory Business Manager position. OSC investigated this matter as a possible violation of 5 U.S.C. 2302 § (b)(12). These regulations prohibit an employee from participating substantially in an official capacity in any matter in which, to her knowledge, she has a financial interest, if the matter will have a direct and predictable effect on that interest. 5 C.F.R. §§ 2635.402(a) and (c). OSC filed a disciplinary action complaint against the former Director, and she signed a settlement agreement in which she accepted a five-day suspension without pay.

Due Process Violation. OSC also settled a case in which a GS-13 attorney-advisor with a federal agency presently stationed overseas alleged that the agency violated his due process rights under federal law and agency regulations by initiating garnishment of wages for an alleged $29,962.82 debt to the agency. The Complainant (Cp) alleged that the agency did not provide him the required opportunity to provide proof that he did not owe this debt.

According to our investigation, the agency initiated the garnishment without affording him due process rights in the federal regulations. Thus, we found reasonable grounds to believe that the wage garnishment violated 5 U.S.C. § 2302(b)(12) because the law and regulations violated implement merit principle § 2301(b)(2).

The agency agreed to stop Cp's wage garnishment ($350 biweekly) and refunded Cp a total of $14,542.57 and $772.44 in interest.

*Summary of Favorable Actions*

Complaints involving allegations of reprisal for whistleblowing – OSC's highest priority – accounted for the highest numbers of the complaints resolved, and the highest numbers of favorable actions obtained by OSC during FY 2005[1]. FY 2005 represented the end of the backlog reduction. The last backlog to be attacked and reduced was that of the Investigation and Prosecution Division. There are two reasons this IPD backlog reduction contributed to a lower number of total favorable actions in FY 2005:

1) The primary focus of the IPD was the backlog of older cases during FY 2005;

2) The majority of these older cases were not strong cases. In most instances, the cases were closed after thorough review.

FY 2006 will be the first year that the IPD will be able to focus primarily on cases received during the current fiscal. Therefore, we expect a higher number of favorable actions on PPPs in FY 2006.

**Table 4**, below, contains summary data (with comparative data for the three previous fiscal years) on all favorable actions obtained by OSC in connection with its processing in FY 2005 of whistleblower reprisal and other prohibited personnel practice complaints.

| TABLE 4 | Summary of Prohibited Personnel Practice Matters Activity – Favorable Actions | | | |
|---|---|---|---|---|
| | | **FY2003** | **FY2004** | **FY2005** |
| Total favorable actions obtained (*all* prohibited personnel practices) | # of actions | 115 | 80 | 45 |
| | # of matters | 83 | 65 | 45 |
| Favorable actions obtained (reprisal for whistleblowing) | # of actions | 75 | 57 | 37 |
| | # of matters | 75 | 49 | 37 |
| Stays negotiated with agencies[c] | | 6 | 11 | 3 |
| Stays obtained from Merit Systems Protection Board | | 1 | 1 | 1 |
| Disciplinary actions negotiated with agencies | | 12 | 11 | 3 |
| Corrective action complaints filed with the Board | | 0 | 1 | 1 |
| Disciplinary actions obtained from the Board | | 1 | 0 | 1 |

[c] Stays and disciplinary actions listed in this table (except for disciplinary actions obtained by OSC from the MSPB) are included in the totals shown in the first two rows above, but are broken out here for further information.

## HATCH ACT MATTERS

*Overview*

Under the Hatch Act, federal employees, employees of the District of Columbia (D.C.) government, and certain employees of state and local governments, are prohibited from engaging in certain types of political activity. The act, as amended in 1993, permits most federal and D.C. employees to take an active part in partisan political management and partisan political campaigns. Nevertheless, there continue to be important restrictions on political activity by federal employees, including prohibitions on partisan candidacy, solicitation of political contributions, and political activity while on duty. OSC issues Hatch Act advisory opinions upon request, enabling individuals to determine whether they are covered by the act, and whether any contemplated political activities are permitted or prohibited by the act.

OSC also receives and investigates complaints alleging past or current violations of the Hatch Act by government employees. In appropriate cases involving past conduct, OSC may send a warning letter, informing the employee about the act, and notifying the employee that engaging in future activity barred by the act will be considered to be a knowing and willful violation. In appropriate cases involving a current violation, OSC may send a cure letter, asking the employee involved to come into compliance with the act by resigning from his or her position, or by withdrawing from candidacy. If OSC determines that the violation warrants prosecution, a written complaint for disciplinary action will be filed with the Merit Systems Protection Board.

*Advisory Opinions*

During FY 2005, OSC issued approximately 2,558 advisory opinions in response to telephone and written inquiries, including e-mails.

*Enforcement Actions*

The following are examples of Hatch Act disciplinary action proceedings filed by OSC during FY 2005, and results obtained that year in cases filed earlier:

<u>Disciplinary action against state or local employees who were candidates in partisan elections</u>. In one complaint a Transportation Engineer with a state agency was charged with running in the 2001 election for Southington Town Council, in violation of the Hatch Act. In another complaint a Home Care Supervisor with a New York City agency was charged with violating the Hatch Act when he was a candidate in the 2004 election for New York State Assembly. In yet another case, a Child Support Enforcement Specialist with an agency in Hawaii was charged with being a candidate in the 2002 election for Hawaii State Representative, 35th District. Lastly, the Executive Director of a Lorain County agency was charged with violating the Hatch Act when he was a candidate in the 2004 primary election for Lorain County Commissioner.

<u>Engaging in political activity on behalf of a Congressional candidate</u>. OSC also filed a complaint for disciplinary action against an employee with a federal agency, charging that he violated the Hatch Act by engaging in political activity on behalf of a Congressional candidate while on duty and in the federal workplace. The employee sent an e-mail to over 300 agency employees inviting them to attend a "meet the candidate" event for Congressional candidate Tim Holden.

Federal employees sending politically partisan electronic mail messages while on duty. One complaint was against a federal employee who sent an e-mail message to about 22 coworkers. The message contained a letter purporting to be written by John Eisenhower, son of former President Eisenhower that states, among other things: " … I intend to vote for the Democratic Presidential candidate, Sen. John Kerry"; " … the word 'Republican' has always been synonymous with the word 'responsibility' … [t]oday's whopping deficit of some $440 billion does not meet that criterion."; "Sen. Kerry, in whom I am willing to place my trust, has demonstrated that he is courageous, sober, competent … I will vote for him enthusiastically …." Prior to forwarding the above-referenced e-mail, she added the following statement: "Some things to ponder……….."

The other complaint also concerned a federal agency employee who sent an e-mail message titled, "Your Vote," to 27 people. The e-mail states, among other things: " … our votes should be for the party that stands firm on morally and ethically correct issues as written in the [B]ible"; "Kerry claims he has morals and ethics … American society under Kerry's command is frightening to even think about." The e-mail then states "Pass along the 'I VOTE THE BIBLE' button" and includes a small picture of the button. In addition, there is a picture of President Bush in front of an American flag with the statement "I VOTE THE BIBLE" superimposed on the picture.

Engaging in political activity on behalf of a political party. OSC also filed a complaint for disciplinary action against a federal attorney with a federal agency, charging that he violated the Hatch Act when engaged in political activity on behalf of a political party while on duty in his government office (e.g., using his government office equipment to receive and send more than 100 e-mails, draft documents and have telephone conversations in support of a political party and its candidates).

Soliciting, accepting, receiving political contributions. OSC also filed a complaint for disciplinary action against a federal employee, charging that he violated the Hatch Act's prohibition against soliciting, accepting or receiving political contributions. The employee was identified as the sender of a letter that was sent to approximately 144 people seeking political contributions for a local candidate, either by attending a reception or sending a check in an enclosed envelope. The candidate's campaign committee sent the letter, but the federal employee was aware of and agreed to the contents of the letter before it was sent.

NJ Candidacy. Also, in December 2004, the Merit Systems Protection Board found that a New Jersey state employee's candidacies, in 2003 and 2004, for Member of the Board of the Chosen Freeholders in Cumberland County, New Jersey, violated the Hatch Act and that her removal was warranted.

MD candidacy. Similarly, in February 2005, the Merit System Protection Board found that a civilian employee of a federal agency violated the Hatch Act, which warranted his removal, when he was candidate in the 2002 partisan election for the Maryland House of Delegates.

Candidate in Partisan Elections. For example, in December 2004, OSC reached a settlement agreement with a state employee with a New York agency, who was charged with being a candidate in the partisan elections for Rochester City Council and New York State Senate, 56th District, in 2001 and 2002, respectively. As part of the agreement, the state employee admitted that she was covered by the Hatch Act and that she violated the Act in 2001 and 2002 by her candidacies in partisan elections. As a penalty for her violations of the Act, the employee agreed that she would resign from FLDDS effective January 7, 2005, and would not seek or accept employment with the State of New York for 18 months.

Soliciting Political Contributions. In March 2005, OSC reached a settlement agreement with the former Chief of Staff of a District of Columbia agency. The official was charged with violating the Hatch Act during a campaign rally on August 8, 2002, by specifically asking D.C. employees, many of whom were his subordinates, to volunteer to work on a reelection campaign. Additionally OSC's petition charged that, in or about May 2002, the official personally and/or through subordinates, solicited political contributions by asking individuals to purchase tickets to the Kennedy-King dinner, a political fundraiser for the District of Columbia Democratic State Committee.

OSC filed its petition seeking his removal from the District of Columbia on July 9, 2004. He voluntarily resigned as Chief of Staff effective August 1, 2004. Under the terms of the settlement agreement, he agreed not to seek or accept employment with the District of Columbia for a period of two years, beginning August 1, 2004.

**Table 5**, below, contains FY 2005 summary data (with comparative data for the two previous fiscal years) on OSC advisory and enforcement activities pursuant to the Hatch Act. In general, OSC's Hatch Act Unit receives more requests for advisory opinions and complaints in election years. Even though FY 2005 was not an election year, the Hatch Act Unit received more requests for written advisory opinions (191) than in FY 2004 (176). In addition, the Hatch Act Unit filed more disciplinary action complaints with MSPB (11) than in FY 2004 (7) and obtained more disciplinary actions (8) than in FY 2004 (2).

| TABLE 5  Summary of Hatch Act Advisory Opinion and Complaint Activity | | FY2003 | FY2004 | FY2005 |
|---|---|---|---|---|
| Advisory opinions issued | | 3,284 | 3,913 | 2,558 |
| New advisory requests received (written) | | 159 | 176 | 191 |
| New complaints received | | 197 | 248 | 245 |
| Warning letters issued | | 43 | 93 | 87 |
| Complaints processed and closed in fiscal year | | 201 | 357 | 310 |
| Corrective actions taken by recipients of cure letters: | Withdrawal from partisan races | 18 | 17 | 4 |
| | Resignation from covered employment | 7 | 8 | 10 |
| | Other | 0 | 6 | 3 |
| | Total: | 25 | 31 | 17 |
| Disciplinary action complaints filed with the Merit Systems Protection Board | | 4 | 7 | 11 |
| Disciplinary actions obtained (through negotiation or ordered by the Board) | | 4 | 2 | 8 |
| Complaints pending at end of FY | | 254 | 146 | 79 |

## WHISTLEBLOWER DISCLOSURES

*Overview*

In addition to its investigative and prosecutorial mission, OSC provides a safe channel through which federal employees, former federal employees, or applicants for federal employment may make whistleblower disclosures - that is, information that they reasonably believe evidences a violation of law, rule, or regulation, gross mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to public health or safety.[10]  Such matters are processed by OSC's Disclosure Unit. Upon receipt of such information, if the Special Counsel determines that there is a substantial likelihood that the information discloses one or more of the kinds of wrongdoing described above, he is required to send the information to the head of the agency for an investigation. OSC does not divulge the identity of the whistleblower without that person's consent. The agency is required to investigate the matter, and send a report from the agency head to the Special Counsel. The required report describes the agency's findings and conclusion. The Special Counsel sends the agency report, any comments by the whistleblower, and any comments or recommendations by the Special Counsel, to the President and congressional committees with jurisdiction over the agency. A copy of the agency report, and any comments on the report, are also placed in a public file located at OSC.[11]  In FY 2005, 485 new matters were received in the Disclosure Unit. There were 19 Agency referrals in FY 2005.

See **Table 6** below, which contains FY 2005 summary data (with comparative data for the two previous fiscal years) on OSC receipts and dispositions of whistleblower disclosures.

| TABLE 6 | Summary of Whistleblower Disclosure Activity – Receipts and Dispositions[d] | | FY2003 | FY2004 | FY2005 |
|---|---|---|---|---|---|
| Pending disclosures carried over from previous fiscal year | | | 556 | 690 | 98 |
| New disclosures received | | | 535 | 572 | 485 |
| *Total disclosures on hand at start of the fiscal year:* | | | 1,091 | 1,262 | 583 |
| Disclosures referred to agency heads for investigation and report | | | 11 | 18 | 19 |
| Agency head reports sent to President and Congress | | | 23[e] | 8 | 16 |
| Results of agency investigations and reports | *Disclosures substantiated in whole or in part* | | 13 | 8 | 16 |
| | *Disclosures unsubstantiated* | | 10 | 0 | 0 |
| Disclosures processed | *In more than 15 days* | | 290 | 1,019[f] | 237 |
| | *In less than 15 days* | | 111 | 135 | 236 |
| Percentage of disclosures processed in less than 15 days | | | 28% | 12% | 50% |
| Disclosure matters processed and closed | | | 401 | 1,154[g] | 473 |

[d] It should be noted that many disclosures contain more than one type of allegation. This table, however, records each whistleblower disclosure as a single matter, even if there are multiple allegations in it.

[e] This number includes reports on disclosures referred to agency heads by OSC before FY 2003.

[f] This number is large due to the backlog reduction effort.

[g] This number is large due to the backlog reduction effort.

*Public Servant Award Ceremony*

Special Counsel Scott J. Bloch presented the Special Counsel's Public Servant Award to Ms. Anne Whiteman on October 6, 2005, for disclosing serious operational errors relating to air traffic control processes used at Dallas Fort Worth International Airport.

> ### "...society needs these lamplighters of integrity who are willing to sacrifice their comfort for the common good."
>
> — Special Counsel Scott Bloch, Public Servant Award Ceremony in Dallas, TX

The IG from the Department of Transportation investigated her allegations, and confirmed that errors had been covered up, which represented safety deficiencies. The FAA is now routinely reviewing airport procedures for compliance. Ms. Whiteman was not only selected due to the gravity of the danger which the erroneous procedures represented to the public, but also for the courage she displayed in repeating the charges until she was listened to and had the charges corroborated.



Ms. Whiteman and the Special Counsel



The award presented to Ms. Whiteman

*Results of Referrals to Agency Heads*

Violation of Security Regulations at Agency Facility. OSC referred allegations to the Secretary of the agency that a lead dispatcher violated security procedures and regulations by admitting individuals to highly sensitive areas of the agency solely on voice recognition. The whistleblower alleged that the dispatcher instructed other employees to admit individuals on voice recognition and that he frequently turned off the National Crime Information Center (NCIC) printer in the agency's Communication Center, preventing the agency from receiving contemporaneous information on security threats and criminal activity from law enforcement agencies and the Department of Homeland Security. Finally, the whistle-blower alleged that the dispatcher made violent and threatening statements to the whistleblower and other employees.

The agency's investigation partially substanti-ated the whistleblower's allegations finding that the dispatcher failed to follow the regulations for admitting individuals in violation of agency regulations. The report stated there were significant concerns with the dispatcher's behavior prior to OSC's referral. In response to the investigation, the agency ordered refresher training on access procedures for protected areas and on the proper operation of the NCIC printer. The agency also made significant management changes, undertaking a compre-hensive reorganization which included convert-ing the position of Chief, Agency Operations Division, from a military to a civilian position and hiring a civilian supervisor. The supervisor and Agency Operating Division Chief in place during this investigation were stripped of their responsibilities and under the reorganization will not hold supervisory positions. Referred May 2003; closed May 2005.

Management Involvement in Kickback Scheme Excused by Agency. The whistleblowers disclosed to OSC that numer-ous employees of the Border Patrol, including some management personnel, were engaged in extensive kickback and fraudulent reimburse-ment schemes in violation of federal law. The whistle-blowers initially made a disclosure to the agency's Office of Inspection General (OIG), and the OIG published a report sub-stantiating many of their allegations. The OIG recommended that the agency take "strong and immediate action" against the employees involved in the wrongdoing. Nearly a year after the OIG made its recommendation, however, OSC discovered that the agency decided to forego disciplinary action. Given the OIG's recommendation, the evident seri-ousness of the wrongdoing identified in the OIG report and agency's refusal to take disci-plinary action, OSC referred the whistleblowers' allegations to the Secretary of the agency for formal investigation by the agency. The agency filed two reports with OSC detailing its investigation into the whistle-blowers allegations. These reports uncritically accepted the assertions of manage-ment personnel that they were unaware of any wrongdoing. OSC's analysis of the agency's reports concluded that the agency's investiga-tion of management appeared pretextual, at best, and that the agencies involved "failed to conduct a thorough investigation." In re-sponse to the press coverage generated by this analysis, the agency publicly committed to thoroughly reinvestigate the whistleblowers' allegations. Referred November 2003; closed May 2005.

## UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT RIGHTS ACT (USERRA)

OSC has a vital role in enforcing USERRA in the federal sector. The Act prohibits discrimination against persons because of their service in the Armed Forces Reserve, the National Guard, or other uniformed services, by making it illegal for an employer to deny any benefit of employment on the basis of an individual's membership, application for membership, performance of service, application for service, or obligation for service in the uniformed services. The right of veterans, reservists, National Guard members, and certain other members of the uniformed services to reclaim their civilian employment after being absent due to military service or training is also protected under the Act. OSC receives referrals of possible USERRA violations by federal executive agencies from the Veterans' Employment and Training Service (VETS) at the U.S. Department of Labor. In such cases, OSC may appear on behalf of, and act as attorney for, the aggrieved person. If the Special Counsel believes the complaint has merit, OSC will initiate an action before the MSPB. At the start of FY 2005, OSC had 12 pending USERRA cases. It received 30 referrals from VETS during the fiscal year. OSC filed five USERRA actions before the MSPB. **Table 7**, below, sets forth the FY 2005 data concerning OSC's receipt and disposition during FY 2005 of USERRA cases (with comparative data for the two previous fiscal years).

| TABLE 7    Summary of USERRA Referral Activity | FY2003 | FY2004 | FY2005 |
|---|---|---|---|
| Pending referrals carried over from previous fiscal year | 8 | 4 | 12 |
| Referrals received from DOL[h] during fiscal year | 7 | 14 | 30 |
| *Pending Referrals closed* | 11 | 6 | 36 |
| Pending referrals at the end of the fiscal year | 4 | 12 | 6 |
| Closed cases where corrective action was obtained (including corrective actions obtained in matters referred to litigation) | 3 | 1 | 6 |
| Closed cases where no corrective action was obtained | 8 | 5 | 25 |
| Closed cases referred for litigation[i] | 0 | 0 | 5 |
| Litigation closed; no corrective action obtained | n/a | n/a | n/a |
| Litigation closed; corrective action obtained | n/a | n/a | 3 |
| Litigation pending | n/a | n/a | 2 |

[h] Department of Labor

[i] No filings before the MSPB occurred prior to Special Counsel Scott J. Bloch's tenure in the 10-year history of the statute.

*USERRA Filings with the MSPB*

Several examples of cases OSC filed with the MSPB in FY 2005 are described below:

Termination due to military absence. Claimant, a full-time staff nurse serving under a temporary appointment, alleged that the agency violated USERRA by terminating her employment because she was excessively absent from the work place due to her military service obligations. The agency had taken the position that claimant's position was not covered under USERRA. USERRA's antidiscrimination provisions, however, cover all types of appointments. OSC filed an action before the MSPB and successfully obtained full corrective action for claimant, namely: back pay (approximately $53,000); the expunging of all negative documentation relating to her termination; and issuance of an SF-50 reflecting that claimant resigned from the agency. Additionally, the agency agreed to undergo USERRA training.

Dismissal from training due to military absence. Claimant had been accepted into a federal agency's 16-week Associate Supervisory training program (ASP). Enrollees who successfully complete the ASP are noncompetitively promoted to supervisory positions. Over the first eight weeks of the ASP, claimant earned excellent performance evaluations and attained a grade point average of 3.65 on a 4.0 scale. While enrolled in the ASP, however, claimant performed reservist duties and was absent from employment and unable to attend the ASP on Saturdays. The agency expressed concern over the fact that claimant's military duties caused him to miss the ASP every Saturday. Moreover, the agency believed there would be an undesirable adverse affect on agency morale when claimant, after completing the program, would be assigned to a junior supervisory position but would be unavailable to work on Saturdays -as is expected of new supervisors- because of his reservist duty. Thus, it was decided to dismiss claimant from the ASP. Because the evidence established that claimant's military service obligations were a substantial and motivating factor in his dismissal from the ASP, OSC determined that the agency violated USERRA. OSC filed a USERRA action before the MSPB and successfully resolved the case with claimant accepting a large cash settlement.

*The USERRA Demonstration Project*

On December 10, 2004, President Bush signed into law the Veterans Benefits Improvement Act of 2004 (VBIA), P.L. 108-454, which changes the manner in which certain federal sector USERRA claims are investigated. Starting on February 8, 2005, pursuant to a demonstration project established by section 204 of the VBIA, OSC rather than VETS will investigate USERRA claims filed by federal employees (and applicants for federal employment) whose social security number ends in an odd-numbered digit. In addition to those claims, OSC will receive and investigate all federal sector USERRA claims containing a related prohibited personnel practice allegation over which OSC has jurisdiction.

Under the demonstration project, VETS will continue to investigate even numbered claims that do not include a related prohibited personnel practice allegation. VBIA does not change the manner in which non-federal sector USERRA claims (i.e., those involving state and local governments and private employers) are received and investigated by VETS. Likewise, OSC will continue to perform its prosecutorial function under the demonstration project.

**Table 8**, below, sets forth the FY 2005 data concerning OSC's receipt and disposition during FY 2005 of USERRA cases (under VBIA, P.L. 108-454; OSC started receiving cases in Feb. '05)

| TABLE 8 | Summary of USERRA Demonstration Project Activity[j] | |
|---|---|---|
| | | **FY 2005** |
| Pending referrals carried over from previous fiscal year | | 0 |
| Cases opened | | 111 |
| Cases closed | | 57 |
| Cases pending at the end of the fiscal year | | 54 |
| Closed cases where corrective action was obtained | | 16 |
| Closed cases where no corrective action was obtained | | 38 |
| Closed cases referred for litigation | | 0 |

---

[j] Under VIBA, P.L. 108-454; OSC started receiving cases in Feb. 2005.

## OUTREACH PROGRAM

The Outreach Program provides OSC speakers and other resources to inform government employees about their rights and remedies under the laws enforced by OSC. To assist other agencies in meeting their statutory obligation under 5 U.S.C. § 2302(c), OSC created an educational program known as the 2302(c) Certification Program.

To participate in OSC's certification program, agencies must agree to: (1) place informational posters at agency facilities about prohibited personnel practices and whistleblowing; (2) provide information about both subjects to new employees as part of their orientation; (3) make information available periodically to current employees about prohibited personnel practices and whistleblower rights and remedies; (4) furnish training to supervisors on prohibited personnel practices and whistleblower protections; and (5) establish a link from the agency's internet or intranet web site to OSC's web site. Once an agency has completed these five steps, OSC issues a certificate of compliance with § 2302(c), which is valid for three years.

In FY 2005, OSC presented 42 outreach programs during FY 2005. In addition, some agencies are using the improved educational materials on OSC's website and doing their own internal education programs. In FY 2005, OSC signed an agreement with the federal GoLearn project, which makes outreach style training available online for the federal workforce, making it possible to reach thousands more federal employees at a fraction of the cost of in-person outreach.

## ANNUAL SURVEY PROGRAM

Each year, as required by 5 USC, Section 1212, OSC surveys persons who have contacted the agency for assistance and whose cases were closed during the previous fiscal year. During FY 2006, OSC surveyed individuals whose complaints were closed in FY 2005. Persons with Prohibited Personnel Practice (PPP), Hatch Act (HA) and USERRA cases were surveyed. They were sent a written notification to facilitate their electronic participation in the survey. The form used for the PPP and USERRA surveys seeks the following information:

• whether potential respondents were fully apprised of their rights;
• whether their claim was successful at OSC or at the MSPB; and
• whether, successful or not, if they were satisfied with the service received from OSC.
• additional questions are asked based on the case type.

The survey results show that only 16% of respondents can recall being informed by their agencies concerning their rights and responsibilities. Although the survey response rate was relatively low, analysis of the results reveals some very encouraging information. For example, while approximately 4% of PPP complainants who took the survey received the result they desired, an average of 20% report satisfaction with the service provided by OSC. This means that 16% of survey respondents were willing to admit appreciation for the level of service provided by OSC, even though their case was closed.

Of those individuals who sought OSC Hatch Act Advisory Opinions, over 67% of them were satisfied or very satisfied (see Hatch Act Results in Appendix C). All FY 2005 survey questions and response tallies are included in Appendices A-D.

## FURTHER INFORMATION[12]

*Annual Report*

Additional copies of this report can be requested by writing or contacting:

> Director of Congressional and Public Affairs
> U.S. Office of Special Counsel
> 1730 M Street, N.W., Suite 218
> Washington, DC 20036-4505
> Telephone:  202-254-3600
> *http://www.osc.gov/documents/reports/ar-2003.pdf*

*Prohibited Personnel Practice Complaints*

Individuals with questions about prohibited personnel practices can contact the OSC Officer of the Week at:

> Complaints Examining Unit
> U.S. Office of Special Counsel
> 1730 M Street, N.W., Suite 218
> Washington, DC 20036-4505
> Telephone:   800-872-9855, 202-254-3630
> Fax: 202-653-5151

The OSC complaint form (Form OSC-11) *must* be used to file a prohibited personnel practice complaint.[13]

The complaint form can be printed from OSC's web site (under "Forms").  Complaints can also be filed with OSC electronically from its web site, *http://www.osc.gov/documents/forms/osc11.pdf*

*Mediation Program*

Questions about OSC's Mediation Program should be directed to:

> Alternative Dispute Resolution Unit
> U.S. Office of Special Counsel
> 1730 M Street, N.W., Suite 218
> Washington, DC 20036-4505
> Telephone: 202-254-3600
> E-mail:     adr@osc.gov

*Hatch Act Questions*

Requests for advice about the Hatch Act can be made by telephone, regular mail, or e-mail to:

> Hatch Act Unit
> U.S. Office of Special Counsel
> 1730 M Street, N.W., Suite 218
> Washington, DC 20036-4505
> Telephone: 800-85-HATCH [(800) 854-2824, 202-254-3650]
> Fax: 202-653-5151
> E-mail:     hatchact@osc.gov

The OSC web site has additional information about the Hatch Act, including frequently asked questions by federal, state and local government employees, and selected OSC advisory opinions responding to common factual situations.

*Whistleblower Disclosures*

Whistleblower disclosures (of information evidencing a violation of law, rule, or regulation; gross mismanagement; gross waste of funds; abuse of authority; or a danger to public health or safety) can be reported in confidence to:

> Disclosure Unit
> U.S. Office of Special Counsel
> 1730 M Street, N.W., Suite 218
> Washington, DC 20036-4505
> Telephone: 800-572-2249, 202-254-3640
> Fax: 202-653-5151

The OSC whistleblower disclosure form (Form OSC-12) may be used to file a disclosure. The form can be printed from OSC's web site (under "Forms"). Disclosures can also be filed with OSC electronically from its web site, *http://www.osc.gov/documents/forms/osc12.pdf*

*Uniformed Services Employment and Reemployment Rights Act*

Questions about OSC's role in enforcing the act may be directed to:

> Director of USERRA
> U.S. Office of Special Counsel
> 1730 M Street, N.W., Suite 218
> Washington, DC 20036-4505
> Telephone: 202-254-3600
> E-mail:        *userra@osc.gov*

*Outreach Program*

For questions about OSC outreach activities, and requests for OSC publications

> Director of Outreach
> U.S. Office of Special Counsel
> 1730 M Street, N.W., Suite 218
> Washington, DC 20036-4505
> Telephone: 202-254-3600
> Fax: 202-653-5151

Many forms and publications are available at OSC's web site (under "Forms" and "E-Library") at *http://www.osc.gov/forms.htm*.

## APPENDIX A

# ANNUAL SURVEY PROGRAM FY 2005

| FY 2005 | |
|---|---|
| Number Mailed | 1,805 |
| Number Returned | 287 |
| Response Rate | 16% |

| What was the nature of your correspondence to OSC? (Please choose only one) | |
|---|---|
| Response Options | FY 2005 |
| You filed a complaint concerning a Prohibited Personnel Practice | 229 |
| You requested a written advisory opinion from OSC concerning a possible violation of the Hatch Act (unlawful political activity) | 42 |
| Your case involved a USERRA complaint | 16 |

# APPENDIX B

## FY 2005 PROHIBITED PERSONNEL PRACTICE SURVEY RESPONSES

| 1. Did the agency against which you filed the complaint inform you about your rights and responsibilities with regard to prohibited personnel practices? | |
|---|---|
| Response options | FY 2005 |
| Yes | 41 |
| No | 165 |
| Do not recall | 20 |
| Never employed by a federal agency | 3 |

| 2. Did you obtain the result that you wanted from OSC? | |
|---|---|
| Response options | FY 2005 |
| Yes | 9 |
| No | 220 |

| 3. Did your complaint include any allegation of reprisal for whistleblowing? | |
|---|---|
| Response options | FY 2005 |
| Yes | 118 |
| No | 102 |

**4. What reason did OSC give for closing any reprisal for whistleblowing allegation in your complaint without obtaining the result that you desired? (Check all that apply.)**

| Response Options | FY 2005 |
|---|---|
| No OSC jurisdiction over your position, the agency, or agency official involved in the complaint | 14 |
| No personnel action taken by the agency involved | 15 |
| Information that you disclosed did not appear to be a legally protected disclosure | 22 |
| Your disclosure occurred after the personnel action involved in your complaint | 3 |
| Insufficient proof that the agency official (who took the personnel action against you) knew about your disclosure. | 11 |
| Insufficient proof of connection between your disclosure and the personnel action involved in your complaint | 31 |
| OSC could not disprove the reason given by the agency involved for the personnel action taken, as described in your complaint. | 15 |
| Insufficient evidence that the personnel action involved in your complaint violated a law or regulation | 33 |
| You or OSC settled the matter with the agency involved | 4 |
| You declined corrective action offered by the agency involved | 0 |
| You notified OSC that you had filed or would file an Individual Right of Action (IRA) or other appeal with the Merit Systems Protection Board (MSPB) | 7 |
| You withdrew your complaint | 0 |
| Other | 45 |
| Do not recall | 14 |

**5. Did you file an Individual Right of Action or other appeal with the MSPB in connection with the same events that you reported in your complaint to OSC?**

| Response Options | FY 2005 |
|---|---|
| Yes | 55 |
| No | 135 |
| Have not decided whether to file | 29 |

| 6. Did you ask for the same relief that you sought from OSC? | |
| --- | --- |
| Response Options | FY 2005 |
| Yes | 48 |
| No | 6 |
| Do not recall | 2 |

| 7. Were you successful at the MSPB in obtaining the same result that you sought from OSC? | |
| --- | --- |
| Response Options | FY 2005 |
| Yes | 4 |
| Partially | 3 |
| No | 27 |
| Appeal pending | 14 |

| 8. If the answer [to the previous question] was "yes" or "partially," how did you obtain that result? | |
| --- | --- |
| Response Options | FY 2005 |
| Settlement | 4 |
| Decision after hearing | 0 |
| Other | 3 |

| 9.   What reason did OSC give for closing your complaint without obtaining the result that you Desired?  (Check all that apply) | |
|---|---|
| Response Options: | FY 2005 |
| No OSC jurisdiction over your position, the agency, or agency official involved in the complaint | 13 |
| No personnel action taken by the agency involved | 4 |
| OSC could not disprove the reason given by the agency involved for the personnel action taken, as described in your complaint | 15 |
| Insufficient evidence that the personnel action involved in your complaint violated a law or regulation | 39 |
| You or OSC settled the matter with the agency involved | 0 |
| You declined corrective action offered by the agency involved | 0 |
| You withdrew your complaint | 1 |
| OSC filed a petition with the Merit Systems Protection Board (MSPB) for corrective action | 0 |
| OSC obtained a decision in the corrective action proceeding filed with the MSPB | 0 |
| Closed for further action on discrimination allegations through EEO processes | 6 |
| Resolved through OSC's Mediation Program | 0 |
| Other | 38 |
| Do not recall | 10 |

| 10.  How would you rate the service provided by OSC in each of the following areas? | | | | | | |
|---|---|---|---|---|---|---|
| | | Very satisfied | Satisfied | No opinion, or N/A | Dissatisfied | Very dissatisfied |
| Courtesy | FY 2005 | 22 | 47 | 45 | 36 | 79 |
| Oral communications | FY 2005 | 15 | 29 | 52 | 36 | 97 |
| Written communications | FY 2005 | 14 | 35 | 17 | 56 | 107 |
| Timeliness | FY 2005 | 20 | 44 | 42 | 41 | 82 |
| Results | FY 2005 | 5 | 8 | 12 | 33 | 171 |

# APPENDIX C

## FY 2005 HATCH ACT UNIT SURVEY RESPONSES

| 1. As a result of our written advisory opinion given to you concerning the proposed political activity, what was the impact? | |
| --- | --- |
| **Response Options** | **FY 2005** |
| The OSC opinion advised that the person in question was free to carry out his or her planned political activity. | 22 |
| The OSC opinion advised that the person in question should not continue his or her planned political activity. | 20 |

| 2. How would you rate the service provided by OSC in the following areas? OSC in the | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Response Options | Fiscal Year | *Very satisfied* | *Satisfied* | *No opinion / inapplicable* | *Dissatisfied* | *Very dissatisfied* |
| Courtesy | **FY 2005** | 21 | 9 | 5 | 1 | 6 |
| Clarity Written Communications | **FY 2005** | 21 | 9 | 2 | 3 | 7 |
| Timeliness | **FY 2005** | 13 | 15 | 1 | 4 | 9 |
| Results | **FY 2005** | 17 | 8 | 2 | 3 | 12 |

# APPENDIX D

**FY 2005 USERRA UNIT SURVEY RESPONSES**

**1. Did the agency against which you filed the complaint inform you about your rights and remedies with regard to USERRA?**

| Response Options | FY 2005 |
|---|---|
| Yes | 0 |
| No | 14 |
| Do not recall | 1 |
| Never employed by a federal agency | 1 |

**2. Did you obtain the result that you wanted from OSC?**

| Response options | FY 2005 |
|---|---|
| Yes | 3 |
| No | 13 |

**3. What reason did OSC give for closing your USERRA case? (Check all that apply.)**

| Response options | FY 2005 |
|---|---|
| No OSC jurisdiction over your position, the agency, or agency official involved in the complaint | 0 |
| You declined corrective action offered by the agency involved | 1 |
| Insufficient evidence that the personnel action involved in your complaint violated USERRA | 5 |
| You or OSC settled the matter with the agency involved | 0 |
| You withdrew your complaint | 1 |
| Other | 8 |
| Do not recall | 0 |

**4. Did you file a USERRA appeal with the MSPB in connection with the same events that you reported in your complaint to OSC?**

| Response options | FY 2005 |
|---|---|
| Yes | 4 |
| No | 5 |
| Do not recall | 4 |

**5. Did you ask for the same relief that you sought from OSC?**

| Response options | FY 2005 |
|---|---|
| Yes | 4 |
| No | 0 |
| Do not recall | 0 |

| 6. Were you successful at the MSPB in obtaining the same result that you sought from OSC? | |
| --- | --- |
| Response options | FY 2005 |
| Yes | 0 |
| Partially | 0 |
| No | 2 |
| Appeal pending | 2 |

| 7. If the answer to previous question was "Yes" or "Partially," how did you obtain that result? | |
| --- | --- |
| Response options | FY 2005 |
| Settlement | 0 |
| Decision after hearing | 0 |
| other | 0 |

| 8. How would you rate the service provided by OSC in each of the following areas? | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Very satisfied | Satisfied | No opinion, or N/A | Dissatisfied | Very dissatisfied |
| Courtesy | FY 2005 | 6 | 0 | 5 | 0 | 5 |
| Oral communications | FY 2005 | 4 | 2 | 2 | 2 | 6 |
| Written communications | FY 2005 | 4 | 0 | 2 | 2 | 8 |
| Timeliness | FY 2005 | 3 | 1 | 3 | 2 | 7 |
| Results | FY 2005 | 4 | 1 | 1 | 2 | 8 |

# APPENDIX E

## ACRONYMS

| | |
|---|---|
| ADR | Alternative Dispute Resolution |
| ALJ | Administrative Law Judge |
| CEU | Complaints Examining Unit |
| CY | Calendar Year |
| DOL | Department Of Labor |
| DOT | Department of Transportation |
| DU | Disclosure Unit |
| FAA | Federal Aviation Administration |
| FY | Fiscal Year |
| HA | Hatch Act |
| HAU | Hatch Act Unit |
| IPD | Investigation and Prosecution Division |
| MSPB | Merit Systems Protection Board |
| OIG | Office of Inspector General |
| OSC | Office of Special Counsel |
| PPP | Prohibited Personnel Practice |
| SPU | Special Projects Unit |
| SSA | Social Security Administration |
| USC | Unites States Code |
| USERRA | Uniformed Services Employment and Reemployment Rights Act |
| VETS | Veterans Employment and Training Services |
| WPA | Whistleblower Protection Act |

ENDNOTES

[1] Reorganization Plan Number 2 of 1978. See 5 U.S.C.A. App.1, § 204. The Civil Service Reform Act of 1978 (Public Law No. 95-454, 92 Stat. 1111) enlarged OSC's functions and powers.

[2] Public law No. 101-12 (1989). Provisions setting forth OSC authorities and responsibilities were codified at 5 U.S.C. § 1211, et seq.

[3] Public Law No. 103-94 (1993), codified in scattered sections of 5 U.S.C. and 12 U.S.C.

[4] Public Law No. 103-353 (1994), codified at 38 U.S.C. § 4301, et seq. The Veteran's Employment Opportunities Act of 1998 (Public Law No. 103-424) also expanded OSC's role in protecting veterans. The act made it a prohibited personnel practice to knowingly take, recommend, or approve (or fail to take, recommend, or approve) any personnel action, if taking (or failing to take) such action would violate a veteran's preference requirement. See 5 U.S.C. § 2302(b)(11). (The former § 2302(b)(11) was redesignated as § 2302(b)(12).).

[5] Public Law No. 103-424 (1994), codified in various sections of title 5 of the U.S. Code. The provision making federal agencies responsible, in consultation with OSC, for informing their employees of rights and remedies under the Whistleblower Protection Act, appears at 5 U.S.C. § 2302(c).

[6] Unless noted otherwise, all references after this to prohibited personnel practice complaints include complaints alleging other violations of civil service law, rule, or regulation listed at 5 U.S.C. § 1216, except for alleged violations of the Hatch Act.

[7] When the Complaints Examining Unit makes a preliminary determination to close a complaint without further investigation, it must by law provide complainants with a written statement of reasons, to which they may respond. On the basis of the response, if any, the unit decides whether to close the matter, or refer it to the Investigation and Prosecution Division.

[8] The 12 prohibited personnel practices are (in substance): (1) discrimination based on race, color, religion, sex, national origin, age, handicapping condition, marital status, or political affiliation (allegations of discrimination, except discrimination based on marital status or political affiliation, are generally deferred by OSC to EEO processes, consistent with 5 C.F.R. § 1810.1); (2) soliciting or considering improper employment recommendations; (3) coercion of political activity; (4) deceiving or willfully obstructing anyone from competing for employment; (5) influencing anyone to withdraw from competition to improve or injure the employment prospects of another; (6) giving an unauthorized preference or advantage to improve or injure the employment prospects of another; (7) nepotism; (8) reprisal for whistleblowing; 9) reprisal for exercising an appeal, complaint, or grievance right; testifying for or assisting another in exercising such a right; cooperating with or disclosing information to the Special Counsel or an Inspector General; or refusing to obey an order that would require one to violate a law; (10) discrimination based on personal conduct that does not adversely affect job performance; (11) violating veterans' preference requirements; and (12) violating a law, rule or regulation implementing or directly concerning merit system principles at 5 U.S.C. § 2301. It should be noted that these are general summaries of the prohibited personnel practices defined at 5 U.S.C. § 2302(b). That section should be consulted for fuller descriptions of the elements of each of these violations.

[9] It should be noted that complaints frequently contain more than one type of allegation. Table 2, however, records all allegations received in a complaint as a single matter.

[10] 5 U.S.C. § 1213(a).

[11] 5 U.S.C. § 1213(c)-(e).

[12] For callers with hearing/speech disabilities, all OSC telephone numbers listed here may be accessed using TTY by dialing the Federal Relay Service at (800) 877-8339.

[13] 5 C.F.R. § 1800.1.

The U.S. Office of Special Counsel (OSC) is an independent investigative and prosecutorial agency and operates as a secure channel for disclosures of whistleblower complaints and abuse of authority. Its primary mission is to safeguard the merit system by protecting Federal employees and applicants from prohibited personnel practices, especially retaliation for whistleblowing. OSC also has jurisdiction over the Hatch Act and the Uniformed Services Employment and Reemployment Rights Act.

Exhibit 2 to Carson v. Office of Special Counsel

Critique of OSC's 2005 (and previous) Annual Reports to Congress with statutory requirements of 5 USC 1218.

OSC's Annual Reports from 1997 through 2005 are available in the "E-library" section of OSC's website <http://www.osc.gov/library.htm>. OSC's Annual Reports for 1989 through 1996 are available on the internet at <http://whsknox.blogs.com/osc/>.)

***A comparison of the law's requirements with OSC's implementation (note: emphasis added throughout).***

5 U.S.C. section 1218, "Annual report"

The Special Counsel *__shall__* submit an annual report to the Congress on the activities of the Special Counsel, including the:
*1)* number,
*2)* types, and
*3)* **disposition** of allegations of prohibited personnel practices (PPP's)  filed with it,
*4)* investigations conducted by it,

*COMMENT: OSC'S Annual Report for years 1989 through 2002 contain tables providing the number and type of PPP complaints filed with it and the number and type of PPP complaints that received field investigations.  OSC's Annual Reports after 2002 do not list the number of each type of PPP complaints received, nor, for each type of PPP complaint, how many received field investigations.*

*No OSC report, from 1989 to 2005, provides the required information on the "disposition of allegations of PPP's filed with it" which, per 1214(a)(1)(A) and (b)(2)(A)), is "whether there are (or not) reasonable grounds to believe a PPP has occurred, exists, or is to be taken," clearly evidencing that OSC does not make and/or report these required determinations.*

*5)* cases in which it did not make a determination whether there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken within the 240-day period specified in section 1214 (b)(2)(A)(i), and
*6)* actions initiated by it before the Merit Systems Protection Board, as well as
*7)* a **description of the recommendations and reports** made by it to other agencies pursuant to **this subchapter**, and
*8)* **the actions taken by the agencies** as a result of the reports or recommendations.

1

*Table listing OSC reports and recommendations made to agencies per 1211 to 1219 and agency responses.*

| where OSC report is described | where agency response is described |
|---|---|
| *1213(c)(1)* | *1213(e)(1)* |
| *1213(g)(1)* | *1213(g)(1)* |
| *1213(g)(2)* | *1213(g)(2)* |
| *1214(b)(2)(B)* | *not specifically mentioned, but possibly by 1214(b)(2)(C) or (D)* |
| *1214(e)* | *1214(e)(1) and (2)* |
| *1215(c)(1)* | *1215(c)(2)* |
| *1216(a)(3), 5 USC 552(a)(4)(F), and 1214(e)* | *1214(e)(1) and (2)* |

*A review of the annual reports from 1989 through 2005 indicates that OSC provided "a description of **some of the** recommendations and reports made by it to other agencies," but only "pursuant to **1213**", instead of "a description of **the** recommendations and reports made by it to other agencies pursuant to this **subchapter**." The report's description of the resulting agency actions is similarly limited.*

*In fact, the annual reports do not describe (or even mention) a single report or recommendation made to the agencies per 1214(b)(2)(B), 1214(e), 1215(c)(1), or 1216(a)(3). This clearly evidences OSC's longstanding failure to comply with its statutory duty to make and report - to the complainant, the agency, and Congress - "whether there are (or not) reasonable grounds to believe a PPP has occurred, exists, or is to be taken; and/or whether there is reasonable cause to believe there has been any violation of any law, rule, or regulation in connection with any investigation its conducts pursuant to this subchapter."*

*Every time OSC determines, in a non-criminal case, "there are reasonable grounds to believe a PPP has occurred, exists, or is to be taken," it **must** make either a 1214(b)(2)(B) recommendation or a 1214(e) report. This is to ensure the head of the agency has the information needed to comply with his duties at 2302(c) - to prevent PPP's - and to ensure Congress is appraised, via OSC's Annual Reports, with descriptions of these PPP's and resulting agency actions.*

*Every time OSC determines there is reasonable cause to believe any violation of any law, regulation, or rule has occurred relative to any investigation it conducts per this subchapter (such as investigation of possible agency FOIA abuses ordered by Federal Courts per 5 USC 552(a)(4)(F) and 5 USC 1216(a)(3)), it must make a 1214(e) report to the involved agency.*

2

*Additionally, by 1219, OSC is required to make publicly available its 1214(e) and 1215(c)(1) reports and recommendations, along with the agencies' responses to 1214(e) reports. These records demonstrate that between 1989 and March 2006, OSC has **not made a 1214(e)** report and **only one 1215(c)(1)** recommendation.*

9) The report required by this section **shall include** whatever recommendations for legislation or other action by Congress the Special Counsel may consider appropriate.

*Not a single recommendation for legislation or other Congressional action, regarding the primary purpose of OSC's existence - protecting federal employees from PPP's, particularly whistleblower reprisal - is made in the 1989 to 2005 OSC Annual Reports to Congress.*

3